No. 2-08-0844        Filed:  4-13-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| JACQUELINE ZAHL, GENE KRUPA, and LYNN KRUPA, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 04--L--1334 |
| RONALD A. KRUPA and JONES AND BROWN COMPANY, INC., | ) ) ) | |
| Defendants | ) ) | |
| (John G. Creighton, Thomas Kulakowski, John Creighton, Larry Wright, Ross Boehmer, Terry Mooney, Patricia M. Dell'Aquila, Marysue Brown, Ron Krol, and Steven Brown, as Directors and Officers of Jones and Brown Company, Inc., Defendants-Appellees). | ) ) ) ) ) ) ) ) | Honorable John T. Elsner, Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiffs, Jacqueline Zahl, Gene Krupa, and Lynn Krupa, appeal the judgment of the circuit court of Du Page County granting summary judgment in favor of defendants, John G. Creighton, Thomas Kulakowski, John Creighton, Larry Wright, Ross Boehmer, Terry Mooney, Patricia M. Dell'Aquila, Marysue Brown, Ron Krol, and Steven Brown.  We affirm.

BACKGROUND

This case comes before us for the second time. In Zahl v. Krupa, 365 Ill. App. 3d 653, 664 (2006) (Zahl I), we reversed the dismissal of plaintiffs' amended complaint. We briefly recapitulate that history and the events since remand that led to this current appeal.

Plaintiffs' amended complaint named Ronald A. Krupa (Krupa), Jones & Brown Co., Inc., and defendants in their capacities as directors and officers of Jones & Brown. Plaintiffs alleged that, at all relevant times, defendants were officers and directors of Jones & Brown and Krupa was president and director of Jones & Brown. Plaintiffs alleged that Krupa solicited money from plaintiffs on the false pretense that the money was for deposit in an investment account, the "Scudder" fund, that Krupa claimed was open to the officers and directors of Jones & Brown and their friends and families. Plaintiffs alleged that no such fund existed and that Krupa admittedly dissipated the money on gambling. Plaintiffs brought claims of breach of contract, fraud, and negligent hiring, supervision, and retention. The breach-of-contract and fraud counts were premised on the assertion that Krupa acted "on behalf of [Jones & Brown] and [defendants], as their agent or apparent agent." The negligence counts alleged that Jones & Brown and defendants, either when Krupa was hired or during the course of his employment, knew or should have known of Krupa's tendency toward deception. Plaintiffs attached to their amended complaint two agreements handwritten on Jones & Brown letterhead (investment agreements). These were two of several agreements that plaintiffs alleged Krupa misled them into signing. The first agreement was signed by Krupa and Jacqueline Zahl and dated December 28, 2002. It read:

> "This letter shall act as the basis of the following agreement between Jacqueline Zahl and Ron Krupa.
>
> Effective 1-1-03, I[,] Ron Krupa (President of Jones and Brown)[,] agrees [sic] to invest $160,000 of Jacqueline Zahl's money into a [sic] investment fund at Jones and Brown.

This is a Scudder Fund only available to members of Jones & Brown's board of directors. The investment will be for a period of seven months yielding a guarantee [sic] net rate of return in the amount of 11.1%.

Thus, Jacqueline's investment [of] $160,000 cash effective 1-1-03 at 11.1% thru 7-31-03 equals a full investment return of $177,760 less processing fees.

Jones and Brown fully guarantees this investment."

The second agreement was signed by Gene Krupa (Gene), his wife Lynn Krupa (Lynn), and Krupa. It was dated May 31, 2003, and provided:

"I[,] Ron Krupa[,] President of Jones and Brown[,] agrees [sic] to invest $100,000 of Gene and Lynn Krupa's money at a rate of 11.1% for a period of 10 months. Thru a Scudder investment fund available only to Jones and Brown['s] Board of Directors.

The net return available 4-01-04 will be $111,100 less processing fees. This money is guaranteed by Jones and Brown."

Under sections 2--615 and 2--619 of the Code of Civil Procedure (735 ILCS 5/2--615, 2--619 (West 2008)), defendants and Jones & Brown moved to dismiss the amended complaint on three grounds: (1) plaintiffs had unclean hands because they gave Krupa funds knowing that the written agreements specifically stated that the Scudder fund was available only to Jones & Brown directors; (2) Krupa was acting strictly in his individual, not corporate, capacity when he signed the agreements; and (3) plaintiffs did not sufficiently allege that Krupa "had either actual or apparent authority to act on behalf of Jones & Brown when [he] entered into the purported agreements with Plaintiffs." The trial court accepted all three grounds and dismissed the amended complaint. Zahl I, 365 Ill. App. 3d at 657.

Plaintiffs appealed, and we reversed. We held that the complaint did not establish the defense of unclean hands as a matter of law. We also held that there was a question of fact whether Krupa signed the agreements on behalf of Jones & Brown. Finally, we found that plaintiffs "pleaded facts that, if true, would prove that Krupa acted with the apparent authority of [defendants and Jones & Brown] in taking plaintiffs' money pursuant to the investment agreements." Zahl I, 365 Ill. App. 3d at 663. We found the claim of apparent authority established by the following allegations:

"(1) Krupa was president of Jones & Brown, had enjoyed that position for 20 years,[1] and was given an office, telephone, and company letterhead for the execution of his duties; (2) Krupa told plaintiffs that Jones & Brown not only allowed but encouraged friends and family of Jones & Brown's officers and directors to invest in the Scudder fund; (3) Krupa previously had taken plaintiffs' money for investing in the Scudder fund with a guaranteed rate of return, and Krupa returned the money with the interest promised; and (4) the investment agreements at issue were written on company letterhead." Zahl I, 365 Ill. App. 3d at 661.

We explained that, since a corporation is a legal entity that acts only through its officers and directors, plaintiffs "were entitled to consider [Krupa's] words and conduct as those of Jones & Brown itself" in judging the apparent authority of Krupa to act on behalf of Jones & Brown. Zahl I, 365 Ill. App. 3d at 661.

We found the present case similar to Denten v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 887 F. Supp. 176, 179 (N.D. Ill. 1995), where the court found that the plaintiff sufficiently pled that Webster, a broker employed by the defendant, had apparent authority to solicit funds from the

_____

[1] It has since come to light that Krupa was president of Jones & Brown since only 2003 but was with the company for nearly 30 years when the alleged fraud occurred.

plaintiff for investment in a radio station. Defendants and Jones & Brown argued that the present case differed crucially from Denten because Jones & Brown was in the construction business, not the investment business like the defendant in Denten. We rejected this argument:

"Plaintiffs' complaint contains no allegations about Jones & Brown's actual business, but such allegations were not necessary to establish apparent authority. The question is not whether Jones & Brown's course of business includes the selling of investment opportunities but whether plaintiffs reasonably believed that Jones & Brown permitted outside parties to invest in a Scudder fund available to its directors. Plaintiffs alleged that they did so reasonably believe. Whether plaintiffs can prove their allegations if defendants prove that Jones & Brown is in a business totally unrelated to investment opportunities remains to be seen." Zahl I, 365 Ill. App. 3d at 663.

On remand, plaintiffs voluntarily dismissed their claims against Jones & Brown, and the case proceeded against defendants and Krupa. Defendants then moved for summary judgment on all counts. See 735 ILCS 5/2--1005(c) (West 2008). Defendants attached to their motion the deposition transcripts of Zahl, Gene, and defendants John G. Creighton, Ron Krol, and Thomas Kulakowski. On the breach-of-contract counts, defendants argued that Krupa had neither actual nor apparent authority to enter into the investment agreements. Actual authority was lacking because defendants neither signed the agreements nor authorized Krupa to sign them. Apparent authority was lacking because plaintiffs should have known that the investment agreements were "outside the scope of [Jones & Brown's] normal business as a steel fabricator and construction contractor." As for the fraud counts, defendants cited authorities, including Brown Leasing, Inc. v. Stone, 284 Ill. App. 3d 1035 (1996), and Macaluso v. Jenkins, 95 Ill. App. 3d 461 (1981), which they claimed hold that "[a] corporate director can only be held personally liable to the victim of a tort if the director personally

participated in its commission." Defendants argued that, since they had no knowledge of the investment agreements, they were not personally liable for Krupa's fraud. On the negligence counts, defendants maintained that they neither knew nor had reason to know that Krupa had the potential for fraud.

We now recount the testimony of the depositions. In doing so, we note that, though plaintiffs' amended complaint does not allege the business of Jones & Brown, it is now undisputed that Jones & Brown manufactures steel for installation in construction projects. There is also no dispute that Krupa was employed by Jones & Brown from October 1973 to August 2004, was a salesman until the mid-1980s when he became vice president of sales, became a board member in the 1990s, and became vice president of Jones & Brown in 2002 and president in 2003.[2]

Zahl testified that she first met Krupa in 1999 or 2000. They had a dating relationship until 2000 or 2001 and afterward remained friends. In 2000, Krupa informed Zahl that Jones & Brown had created an investment fund to raise money to expand the business. The fund was open to board members of Jones & Brown. A board member could also invest funds from friends and family under the member's name. Krupa told Zahl that Jones & Brown manufactured steel but also "made investments." Krupa said that the investment would be "short term," 120 days, and have an 11.1% return. He said that "Jones & Brown guaranteed the fund 100 percent [and] there was no way to ever lose your money." Krupa also told Zahl that he would take out a life insurance policy to secure her investment. After Zahl researched the "financials" of Jones & Brown and found that the company was "solid," she decided to invest. Krupa asked for the funds in cash. Zahl gave Krupa $10,500, and

---

[2]The record does not explain the distinction between vice president of sales and vice president of Jones & Brown. For our purposes here, any likely difference would be inconsequential.

Krupa handwrote the terms of the agreement on Jones & Brown letterhead dated August 3, 2000. Zahl testified that Krupa also prepared a typewritten contract but that she no longer had it. Zahl did not ask Krupa for any documentation to confirm that Krupa actually invested the funds.

Zahl testified that Krupa returned the first investment, in cash at the promised rate of interest, on the agreed due date. In January 2002, Krupa said that Jones & Brown was again accepting money for the investment fund to raise money for machinery. The investment term was four months and the guaranteed rate of return was 12.3%. Krupa explained that Jones & Brown was able to offer such a high rate of return because the company's own rate of return was higher. Zahl gave Krupa $66,000 in cash to invest. Krupa typed the terms of the agreement on Jones & Brown letterhead. This agreement, dated January 16, 2002, identified the fund as a "[S]cudder fund." Zahl did not ask for any additional documentation. At the end of the agreed term, Krupa paid Zahl back in cash with the agreed interest.

Zahl testified that the third and final time she gave Krupa money for investment was in December 2002. Krupa said that the fund was open again but probably for the last time. Krupa also noted that there was a cap this time on how much could be invested. The interest rate was 11.1% and the term was seven months. Zahl gave Krupa $160,000. Krupa handwrote the agreement on Jones & Brown letterhead dated December 28, 2002 (this agreement was attached to the amended complaint). Zahl's mother also invested in the fund this time and a written agreement was prepared. Again, Zahl did not request any documents other than the agreements themselves. Seven months later, Zahl asked for the funds. Krupa initially said there was a delay due to paperwork. Zahl phoned a week later and Krupa repeated the explanation. Several weeks passed without Krupa returning any of the investment. Concerned about her money, Zahl went to Jones & Brown's offices on a weekend and saw Jerry Creighton, the company's chief executive officer (CEO) and chairman. Zahl informed

Creighton about the investments she made and that Krupa was overdue in returning her latest investment. Creighton denied that Jones & Brown had any investment fund. Creighton said he would speak to Krupa and report back to Zahl. After some time passed with no word from Creighton, Zahl called him. Creighton said he had spoken to Krupa, who claimed that Zahl was "crazy" and that the matter "had nothing to do with the company." Zahl believed at this point that she was being "completely scammed." She could not accept that Creighton knew nothing about the fund. Zahl believed that Creighton might be "in cahoots" with Krupa. Zahl tried to contact Krupa again but he "didn't want to talk to [her] anymore."

Zahl testified that she eventually was able to arrange a meeting with Krupa. Zahl's boyfriend and mother also attended the meeting. Krupa told Zahl that her money "got lost in the market." Zahl said she did not believe Krupa and threatened to contact Creighton. Krupa then confessed that he lost the money gambling. Zahl told Krupa she did not believe this account either. Krupa insisted it was true and asked to work out a payment plan with Zahl. Zahl received none of her $160,000 back from Krupa.

Zahl testified that Krupa made all three investment offers while they were in his office at Jones & Brown. The funds for the investments were also received and repaid at Krupa's office. These were among "several" occasions where Zahl visited Jones & Brown during business hours. During these times, Zahl saw other employees of Jones & Brown but "did not know them" and only "[said] hello." Zahl tried to see Creighton during these times but he was "never there," and thus it seemed to Zahl that no one else at Jones & Brown "had authority above what Krupa had." Zahl attended two social events with Krupa and other Jones & Brown employees: a baseball game and a picnic. On neither occasion did Zahl mention the investments. Zahl testified that Krupa would phone her from his office

at Jones & Brown and that she would phone him there. When she and Krupa went out to dinner, he would pay with his company credit card.

Zahl testified that, prior to the problems with the third investment, the only person to whom she mentioned the investments was her mother. Zahl claimed that, when she made the investments, she had no reason to believe that Krupa was not acting in his capacity as president of Jones & Brown.

Gene, Krupa's older brother, testified that Krupa presented him with an "investment opportunity" at Jones & Brown. They discussed the opportunity in various places: over the phone while Krupa was at his office at Jones & Brown, in person at Krupa's office, and at restaurants. Krupa would buy the meals with what Gene presumed was a company credit card. Gene testified that Krupa also invited him to sporting events where Jones & Brown paid for the tickets. Gene thought that they "probably" discussed the opportunity at these events as well. Gene testified that Krupa also had a company car.

Gene testified that the interest rate Krupa promised on the investment was "above the normal." Gene nonetheless had "confidence" in the transaction because he trusted both Krupa and Jones & Brown and was familiar with Scudder, "the financial institution [the investment] was tied with." In 2002, Gene wrote Krupa a check for $63,000 for investment in the fund. The terms of the agreement were written on Jones & Brown letterhead. Krupa, Gene, and Lynn signed the agreement. Gene did not keep a copy of that document. On January 1, 2003, the end of the investment period, Krupa wrote Gene a check for the promised amount.

Gene stated that, in 2003, he discussed with Krupa the possibility of investing again in the Scudder fund, at a higher interest rate than before. Gene agreed to invest $100,000 at a rate of 11.1%. On May 31, 2003, Krupa, Gene, and Lynn executed a contract on Jones & Brown letterhead. (This agreement was attached to the amended complaint.) Gene wrote Krupa a series of checks

totaling $100,000. At the end of the investment term, in April 2004, Gene asked for his money. Krupa said that he had dissipated the money on gambling and that there was no Scudder fund. Krupa returned none of the $100,000. Gene testified that he "never" spoke to anyone at Jones & Brown about the $100,000 transaction.[3]

Gene testified that he met Zahl when she was dating Krupa. Neither Gene nor Zahl mentioned the purported investment opportunities. Gene first heard of Zahl's involvement in Krupa's scheme after Gene gave Krupa the $100,000. Zahl contacted Gene and said that she also had given Krupa money and that he later confessed to having gambled away the money.

Jerry Creighton testified that he had been a board member of Jones & Brown since the 1960s. Creighton was chairman of Jones & Brown from 1999 to 2003. He also became CEO in 1999 and in that role had "oversight" of the operations of the company and particularly of the "employees' " and "executives' " "activities on behalf of the company." When Krupa was president of Jones & Brown (from 2003 until August 2004), he reported to Creighton, who "held great trust in him." As president of the company, Krupa held "a lot of authority and discretion" and had "a lot of freedom of movement."

Creighton testified that, in late 2003 or early 2004, when Creighton was chairman and Krupa was president, Krupa came to Creighton in private. Krupa said that his daughter had been in a "very serious" car accident. Krupa said that the accident caused serious injuries and a possible fatality, and that his daughter was facing sizeable legal and medical bills. Krupa asked Creighton for a loan from Jones & Brown. Creighton suggested that they both speak to Tom Kulakowski, who was then

---

[3]Gene was not asked whether he spoke to anyone at Jones & Brown about the first investment opportunity Krupa offered.

secretary-treasurer of Jones & Brown and a board member. They went to Kulakowski's office and spoke to him in private. As Creighton relayed the situation to Kulakowski, Creighton feared that Krupa was going to "pass out" because his eyes were "tearing" and he was "gasping for air." Krupa claimed that he did not have insurance to cover the liability and that he was faced "with going bankrupt." Krupa asked for a loan of $135,000. Krupa did not produce any evidence to corroborate his story. Creighton "took [Krupa's] word" and decided to make the loan because the circumstances were dire and because of Krupa's long service to Jones & Brown. Creighton suggested that the loan be given in three installments of $45,000 rather than a lump sum. Creighton did not consult the board before approving the loan. Creighton noted that Jones & Brown "over years *** had a policy" of lending "off and on to individuals depending on the situation." Creighton "felt" he had authority to approve the loan on his own; "[n]obody" told him he could or could not do so.

Creighton testified that he had Krupa sign a note for the loan but kept it in Kulakowski's office. Over the next several months, Creighton had Kulakowski write Krupa company checks for three installments of $45,000. Creighton testified that he never attempted to verify Krupa's story about his daughter's accident:

"Q. Did you do anything whatsoever, sir, to figure out what [Krupa] did with the first $45,000?

A. No.

Q. Nothing?

A. No.

Q. And you didn't direct anyone to do so, did you, sir?

A. No.

Q. That was a mistake, wasn't it?

A. Yes.

\* \* \*

Q. And when you learned of the second payment of $45,000, you did nothing whatsoever to verify the veracity of [Krupa's] story or what he was doing with this money, did you, sir?

A. No, I did not.

Q. And you didn't direct anyone to do so, did you, sir?

A. That's correct.

Q. That was another mistake, wasn't it?

A. Yes.

Q. That was poor supervision on your part, wasn't it?

\*\*\*

A. Obviously the way this turned out.

Q. It was poor supervision, wasn't it?

\*\*\*

A. I would have to agree based on what has happened.

Q. And it was poor supervision to give him the first $45,000, wasn't it?

\*\*\*

A. That is correct.

\* \* \*

Q. And between the second and third payments, again you didn't lift a finger to verify [Krupa's] story or to verify where that money was going?

\*\*\*

A. That's correct.

Q. You didn't direct anyone to do so either, did you, sir?

A. That's correct.

Q. Again, that was a mistake, right?

***

A. Correct.

Q. Poor supervision, right?

***

A. Yeah." (Emphases added.)

Creighton testified that, in accordance with the agreed payment plan, amounts were deducted each month from Krupa's paycheck.

Creighton testified that, in the six or eight months between the first loan to Krupa and Zahl's notifying him that Krupa owed her money, he told no other board member about the loan to Krupa. Creighton noted that the board would not have found out about the loan to Krupa in the ordinary course of its duties:

"Q. And there were multiple board meetings between the time *** this first check [was] paid, and the time that you met with [Zahl] six or eight months later, right?

A. There would have been probably two.

Q. Weren't there financial reports and financial documents given to the board members at those meetings?

A. No.

Q. So there is no way the board members could figure out that this loan was made?

-13-

There [were] no documents or other financial records they could have reviewed to disclose this?

A. That's correct.

Q. Did you do anything out of the ordinary to make sure that they didn't find out from the financial records?

A. No. No, I did not."

Creighton testified that he also did not inform the Brown family, who were part-owners of Jones & Brown, about the loan until after Zahl came forward. Creighton testified that he kept the matter to himself out of concern for Krupa's privacy. Creighton "expected" that Kulakowski would keep the matter private but he never asked Kulakowski to do so. Creighton testified that he also did not tell Jones & Brown's outside counsel, Thomas Moran, or its outside auditor about the loan until Zahl came forward.

Creighton testified that, on June 27, 2004, Zahl came to Jones & Brown's offices wanting to see him. Zahl said that Krupa had persuaded her to invest in a purported fund at Jones & Brown that was fully guaranteed. Krupa, said Zahl, was overdue in returning her latest investment. Creighton told Zahl that he would discuss the matter with Krupa. The next day, Creighton met with Krupa in his office at Jones & Brown. Krupa said that the matter Zahl alluded to was strictly personal and did not involve the company. A few days later, Zahl contacted Creighton to inquire about the meeting with Krupa. Creighton arranged a meeting with her and Krupa for July 7, 2004. After scheduling the meeting, Creighton met privately with Krupa again. Krupa admitted that he spent both the money from Zahl and the loan from Jones & Brown on gambling. Creighton then informed Moran of Krupa's revelation and of the upcoming meeting. Creighton could not recall whether he told Moran

of Jones & Brown's loans to Krupa. Moran told Creighton to "refer all questions" at the July 7 meeting to Moran.

Creighton testified that, on July 7, 2004, he met in a hotel lobby with Krupa, Zahl, Zahl's mother, and a friend of Zahl's. Creighton acknowledged that his notes of the meeting, prepared later that day, state: "At the start of the meeting[,] *** I stated to all the parties present I was not there as an officer of Jones & Brown Company, nor did I represent Jones & Brown Company in any manner. I was there as a friend of [Krupa's]." Creighton testified that he made this statement at Moran's direction. According to his notes, Creighton also said: "If they wanted to discuss the company in any way, it would have to be through the company's legal counsel." Creighton made this statement, too, at Moran's direction. Creighton testified that he and Kulakowski did not inform the Browns or the other directors about the loans or Krupa's confession until after the July 7 meeting. Creighton "felt it was a matter that [he] was handling."

Creighton testified that he regretted not disclosing earlier the loan to Krupa, Zahl's accusation, or Krupa's later confession. It was an "error" and a "mistake" to approve the loan without consulting the Browns or the board. It was also a "mistake" and "poor supervision" to keep the note for the loan to Krupa in Kulakowski's office and to not mention the loan to Moran or the outside auditor. The Browns had a "right" to know about Zahl's accusation and it was a "terrible mistake" not to tell them.

Creighton was asked about any indication he or anyone else at Jones & Brown might have had that Krupa was soliciting funds for a fictitious investment fund at Jones & Brown. Creighton testified that he first met Zahl in 2002 at a sports event attended by Jones & Brown employees. Krupa introduced Zahl as his "lady friend." Creighton said that he never saw Zahl at Jones & Brown's offices until she came to see him on June 27, 2004. Creighton testified that Krupa's office was "right next to his" but that they did not share a common wall. Creighton never inquired whether anyone else

at Jones & Brown saw Zahl at the offices. Creighton testified that the receptionist's desk at Jones & Brown is situated in a main lobby behind which is a suite of offices for the company's executives. Unless one approached the suite from the rear of the building, one would pass the receptionist's desk on the way to the executives' offices. Jones & Brown had a policy of requiring first-time guests, or at least guests unfamiliar to the receptionist, to sign in. Creighton did not know whether the policy was in writing. According to Creighton, the company did not review the visitors logs. Creighton did not know where, if at all, the logs were stored, and to his knowledge no one had ever consulted the logs to determine whether Zahl visited Jones & Brown. Asked if it would have been prudent to make those inquiries, Creighton said, "Hindsight is wonderful." Creighton also testified that, to his knowledge, neither Gene nor Lynn ever visited Jones & Brown, but Creighton admitted that no one at the company had ever attempted to verify this.

Creighton testified that, before Zahl came forward, the only gambling he knew Krupa to engage in was sports pools at Jones & Brown, of which there were two to four per year. Creighton testified that he did not know how Krupa spent his free time. Their conversations about their personal lives consisted of just "passing remark[s]."

Creighton also described Jones & Brown's policies against personal use of company time and property. According to Creighton, it was a "standard business practice" at Jones & Brown for employees not to use any company materials for personal business. As Creighton explained, there was not a written policy with respect to every type of company material. There was an unwritten policy against personal use of company letterhead. Creighton admitted that "there was no system in place whatsoever" to ensure that employees not use company letterhead for personal business. Also, to Creighton's knowledge, no one at Jones & Brown ever told Krupa that he could not use company letterhead for personal business. Asked if this meant that there was "virtually no oversight" of

Krupa's activities, Creighton answered: "Well, I suppose it's pretty easy for anybody to put letterhead paper in their case and leave at any company anywhere." Creighton, however, admitted that, "reviewing it from this perspective," the failure to enforce the policy against personal use of company letterhead was a "mistake." Creighton testified that it was only after Zahl came forward that Creighton learned that Krupa had prepared false investment contracts on Jones & Brown letterhead.

Creighton testified that Jones & Brown also had a policy against personal use of company phones. Creighton believed that this policy was in writing. Creighton admitted, however, that the policy was "absolutely unenforced" because the company "trusted" its employees. Creighton admitted that this was an "insufficient internal control" and that in "hindsight" the policy should have been enforced.

Creighton stated that Jones & Brown also had an unwritten policy against using employee offices for personal business, but to his knowledge no one at Jones & Brown ever informed Krupa of that policy. Creighton admitted that it was a "mistake" to have "absolutely no controls in place to monitor whether employees were using company offices to conduct non-company business."

Creighton noted that, when Krupa was president, he retained a company car from his time as vice president of sales. There was a written policy at Jones & Brown restricting company cars to company business, but to Creighton's knowledge nothing was done to enforce the policy. Krupa also had a company credit card. Creighton believed there were "limitations" on the use of company credit cards but did not know whether there was a written policy. Statements for company credit cards were reviewed by the executives' administrative assistant, who would refer to Creighton any questionable charges. No charges on Krupa's credit card were ever referred to Creighton for review. To Creighton's knowledge, no one at Jones & Brown had performed a second review of Krupa's

statements for personal charges such as gambling. Creighton admitted that he was "negligent in his supervision" of Krupa.

Creighton acknowledged that, in the minutes of a Jones & Brown board meeting on September 16, 2003, there is the following entry: "Mr. Bunge cautioned about lack of internal controls because of, among other things, the small size of the accounting staff." Creighton explained that Bunge was a consulting accountant for Jones & Brown. Creighton testified that, to his mind, "internal controls" were "a form of control of management" or "an overseer from one position to the next to ensure that you have control, the company has control." Creighton could not recall whether Jones & Brown took action in response to Bunge's admonition. Creighton did not know whether there were "any internal controls whatsoever [that] [Jones & Brown] had for the supervision of the activities engaged in by the president, [Krupa]." Creighton noted that Krupa's misconduct was partly the reason why Jones & Brown instituted a written "Code of Conduct" in October 2004. Creighton could not recall whether there was any such code before October 2004.

Tom Kulakowski testified that he was hired by Jones & Brown in 1985 as a credit manager. In 1990, he was promoted to secretary-treasurer and became a board member. He held that position until his employment with Jones & Brown was terminated in January 2005. The stated reason for his termination was that the company "was going in a different direction." Kulakowski did not believe his termination was related to Krupa's misconduct.

Kulakowski testified that "either Creighton or the board" had "responsibility for and oversight over creating and enforcing policies at Jones & Brown." Creighton, as chairman and CEO, had direct "oversight" over Krupa but Kulakowski assumed that the board as a whole "would be able to oversee [Krupa] if there was a question raised."

Kulakowski knew Krupa "fairly well" but did not speak to him about "things outside of work" except that they discussed "family matters" in a "casual way" and "never in depth." Kulakowski went to several group social events where Krupa was present. Once or twice a year, the Jones & Brown executives, who were all "friends," would go to a sporting event. Once a year, there was a company-wide event. Kulakowski testified that Jones & Brown employees had office pools on sporting events. Krupa always entered these pools but did not place more wagers than others at Jones & Brown. Kulakowski did not know of any other gambling by Krupa.

Kulakowski stated that he did not recall seeing Zahl at any of the group events attended by Jones & Brown employees. Kulakowski first met Zahl at a festival in North Aurora. Krupa introduced Zahl as his girlfriend. Kulakowski stated that Jones & Brown employees had infrequent visitors at the offices, but his knowledge was limited because he did not have a view of the reception area from his office and thus would not have been aware of visitors unless they came into his office. Visitors were required to "check in" with the receptionist but there was no sign-in sheet. Kulakowski did not recall seeing Zahl at Jones & Brown. Kulakowski and Krupa had contiguous offices but visitors would not normally pass his office on the way to Krupa's.

Kulakowski was not aware of any written policies at Jones & Brown restricting the use of company letterhead or offices, but it was "generally understood" that company property was for company use only. Employees were allowed only occasional use of company phones for personal business. The executives' offices at Jones & Brown were well insulated and Kulakowski could hear Krupa in his office only if his door was open. Kulakowski testified that Krupa had a company credit card because each salesman at Jones & Brown had one and Krupa continued to make sales even as president. Company credit cards were restricted to business use, and reimbursement was required for personal charges. Kulakowski was in charge of reviewing credit card bills to ensure that the

charges were appropriate. Kulakowski would ask an employee for any necessary reimbursement. Only in "extreme circumstances" would Kulakowski bring a personal charge to the attention of anyone else at Jones & Brown. Krupa sometimes used his credit card for personal business, as did "all the salesmen," but Kulakowski could recall nothing that "stood out" on the bills for Krupa's card. Kulakowski testified that it was not until Creighton said Krupa was being fired that Kulakowski first learned that Krupa was using company property "to obtain money from individuals outside of the work context."

Kulakowski testified to the procedures by which employees could receive loans from Jones & Brown. All check requests came to Kulakowski for approval but he would refer all loan requests to one of the owners of Jones & Brown. When Creighton, himself a part-owner, was chairman and CEO, Kulakowski referred loan requests to him. Kulakowski testified that loans were not given "very often" but Kulakowski recalled several employees besides Krupa who took loans. Kulakowski once took an $18,000 or $19,000 loan to purchase a car. Bob Carpenter, former vice president of sales, once took a loan. John Johnson and Wilson Brown, former CEOs of Jones & Brown, took out loans "all the time." Johnson once had a loan balance around $60,000. Kulakowski testified that he never questioned the loan requests of Jones & Brown owners such as Creighton and his predecessors Johnson and Brown.

Kulakowski recounted the loans and advances Krupa took from Jones & Brown. Twice, in 1984 and 1986, Krupa received an advance on his bonus check. Krupa also took the following loans:

| | |
|---|---|
| May 26, 2000 | $9,500 |
| October 1, 2002 | $60,000 |
| April 1, 2002 | $46,000 |
| April 15, 2002 | $45,000 |

April 29, 2002 $45,000

Kulakowski testified that Creighton would have approved all of these loans. Kulakowski noted that, as of April 2002, Krupa had a loan balance of $186,000. Kulakowski considered that balance "large" for a nonowner of Jones & Brown. Asked if the sheer size of the balance "raise[d] any warning flags" at the time, Kulakowski replied that he did not question any loan approved by Creighton. Kulakowski gave the same reply when asked whether it was "unusual" for such a cluster of loans to follow a gap of 15 years. Kulakowski added that, until the incident with Zahl came to light, he had never known Krupa to be untrustworthy.

Kulakowski testified that the loans since 2000 were in part due to Krupa's claim that his daughter was in a car accident. Krupa "broke down" in recounting the accident to Kulakowski. Krupa asked for a loan from Jones & Brown to cover expenses relating to the accident, and Kulakowski directed Krupa to speak with Creighton. Ultimately, Creighton approved the loan and directed Kulakowski to issue a check. Krupa agreed to a payment schedule and made payments accordingly. Kulakowski did not investigate Krupa's story about the accident or have him substantiate it. When Krupa was terminated, he owed Jones & Brown $110,956. Kulakowski did not recall any discussion of Krupa's loans at company board meetings.

Kulakowski explained that Bunge's concern, at the September 15, 2003, board meeting, about a lack of "internal controls" was in reference to the fact that the accounting department was too small and did not have proper checks and balances in that Kulakowski was the only person in the department who wrote checks. Bunge's remark had nothing to do with abuses within the accounting department with regard to employee loans, because Kulakowski had no authority to approve loans in any case. Kulakowski acknowledged that the minutes for the board meeting of April 29, 2003, contain this notation:

"The next item on the agenda was the review and approval of officer salary, bonus and loan policy, and the consideration of abbreviated employment agreements. Mr. [Ron] Krol moved that all officer salaries, bonuses, and benefits be pre-approved by the entire Board; his motion was unanimously approved."

Kulakowski assumed that "loan policy" referred to "any outstanding loans that the company had with any employees" and that Krupa's loans "could very well" have been in mind.

Ron Krol testified that he had been a board member of Jones & Brown since February 2001 and chairman since April 2003. He had never been employed by the company. Krol's wife was the daughter of Wilson Brown, part-owner of the company. Krol described the board's work as "strategic planning." Krupa did not report to Krol, who was not at Jones & Brown on a "daily basis." Krupa reported to Creighton. Krol was introduced to Krupa at Krol's first board meeting. On one occasion, Krol and Krupa met outside of Jones & Brown to discuss work. Krol did not know what Krupa did in his free time. Krol first heard of Zahl in July 2004 when Creighton informed Krol that Krupa had improperly acquired funds from Zahl.

Krol testified that, in August 2001, he was reviewing Kulakowski's interim financial statement for the second quarter of 2001 when Krol discovered a reference to an "employee loan." The loan recipient was not identified. Krol could not recall the exact figure but remembered that it was in excess of $100,000. Krol believed that the financial statement was sent to all board members. Concerned about the loan, Krol called Kulakowski at his office, but he was not in. Krol was transferred to Krupa and asked him about the loan. Krupa explained that Jones & Brown occasionally made loans to employees. Krupa told Krol to contact Creighton about the loan.

Creighton told Krol that the loan was for Krupa, who claimed he needed the funds to cover expenses stemming from his daughter's car accident. Krol told Creighton that the loan was "not

appropriate," because lending was not Jones & Brown's business, and that Creighton exceeded his authority as CEO in making the loan. Krol then informed the Browns about the loan. Krol did not inform the other board members, because Creighton and Kulakowski already knew of the loan and Krupa had agreed to a payment schedule and was making payments. In late 2001 or perhaps 2002, Krol hosted the stockholders of Jones & Brown at his home. Creighton and the Browns were present, as were the attorneys for Jones & Brown. Krol mentioned the loan in front of all who attended. Creighton said he would personally guaranty the loan. Subsequently, Kulakowski prepared a list showing that Jones & Brown had made "multiple" loans to Krupa totaling over $100,000. When Creighton approached Krol in July 2004 and told him about Zahl, Creighton mentioned that he believed that Krupa also lied about his daughter's accident. Krol admitted that he never attempted to verify Krupa's story. Krol's primary concern was that Jones & Brown "got repaid" and it appeared that Krupa was making payments on the loans. Krol testified that it was not until Zahl filed her suit that he learned Krupa used company offices and letterhead to defraud Zahl. Krol believed that Creighton "exceeded his authority as CEO" in making the loans to Krupa. Krol, however, cited no basis for that belief.

Plaintiffs filed a response to the summary judgment motion. They argued that this court "already determined that [Krupa's] use of his office of President, his years with [Jones & Brown], his use of [Jones & Brown] offices, letterhead, and telephone, as allowed by [defendants and Jones & Brown], would prove he acted with the apparent authority of defendants in taking [plaintiffs'] money at issue here."

Plaintiffs attached the sworn statement of Krupa. Krupa testified that, when he was president of Jones & Brown, he reported to Creighton but had "virtually complete autonomy" for "[m]ost issues." For "very important" matters such as delinquent payments by customers, problems with

completing work orders, or "really anything related to employees," Krupa sought direction from Creighton or raised the matter at a board meeting. Krupa prepared his own expense reports at Jones & Brown. Krupa insisted that his expense reports were always truthful and that he never attempted to expense anything related to gambling. Krupa testified that he had authority to sign contracts for Jones & Brown. He was also able to sign checks for Jones & Brown for a "certain period of time as president" but otherwise only Creighton or Kulakowski could sign checks. Krupa testified that, out of respect for his privacy, the loans he took from Jones & Brown were never discussed at board meetings. Krupa spent the loan proceeds on gambling. Creighton never attempted to verify why Krupa needed the loans; Krupa surmised that this was because he was a "dedicated employee" who had 29 years of service at Jones & Brown, missed work infrequently, and set sales records. Krupa testified that there was an employee handbook at Jones & Brown but that the company did not "really" enforce it.

Krupa testified that he did not socialize with his fellow Jones & Brown employees except for occasional company events. Once, when he was vice president of sales or president of Jones & Brown, Krupa brought Zahl to a company event. Krupa could not recall whether Zahl met other Jones & Brown employees at that event. Zahl would visit Jones & Brown's offices "once in a while." As with all visitors, Zahl would pass the receptionist's desk. The receptionist kept no log of who visited Jones & Brown.

Krupa stated that his gambling habit began during the 30 years he was at Jones & Brown. He never went gambling with anyone at Jones & Brown or went gambling during work hours. Krupa once saw a fellow employee at a racetrack. Krupa spoke to her "for about five minutes saying hi to her, that's about it."

The trial court granted summary judgment for defendants on all counts. The court reasoned:

"First, [the] individual directors are not liable for the corporate breach of contract. The directors were not parties to the contract, and Counts 1 and 2 are for breach of contract. Summary judgment is entered for each of the directors on each count of breach of contract.

Second, the individual directors can be held liable for their own fraud, but not for the fraud of an employee unless they participated or somehow assisted. There are no facts in this case that would, when viewed in the light most favorable to the plaintiffs, show that any director participated or assisted [Krupa] in the fraud, and therefore, summary judgment is to be entered as to the individual directors.

* * *

Next, the directors cannot be held liable for negligent hiring *** due to Krupa being unfit for the job, [because] there is no evidence that the directors knew or should have known of Krupa's gambling problems. The plaintiff[s] argue[] for a standard that the activity should have raised a flag. Raising a flag is not the standard in the case that there was no breach of a common law duty."

The court found that the parties' arguments on apparent authority "go to the corporate defendant, Jones & Brown, and not to the individual directors."

Subsequently, the court entered a default judgment against Krupa. Plaintiffs then filed this timely appeal from the order granting summary judgment.

ANALYSIS

Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2--1005(c) (West 2008). In considering a motion for summary judgment, the court must view the record in the light most

-25-

favorable to the nonmoving party. Land v. Board of Education, 202 Ill. 2d 414, 433 (2002). "Although summary judgment aids in the expeditious disposition of a lawsuit, it is a drastic measure and should be granted only if the moving party's right to judgment is clear and free from doubt." Land, 202 Ill. 2d at 432. "A motion for summary judgment does not ask the court to try a question of fact, but to determine if a question of material fact exists that would preclude the entry of judgment as a matter of law." Land, 202 Ill. 2d at 432. While "the nonmoving party is not required to prove his case in response to a motion for summary judgment, he must present a factual basis that would arguably entitle him to judgment." Land, 202 Ill. 2d at 432. "A motion for a summary judgment should be denied if the facts in the record present more than one conclusion or inference, including one unfavorable to the movant." Hahn v. Union Pacific R.R. Co., 352 Ill. App. 3d 922, 928 (2004). That is, summary judgment should not be entered unless the moving party's right to judgment is " 'clear and free from doubt.' " Mydlach v. DaimlerChrysler Corp., 226 Ill. 2d 307, 311 (2007). We review de novo the trial court's grant of summary judgment. Hahn, 352 Ill. App. 3d at 929.

The breach-of-contract claims against defendants are functionally just fraud claims. "Corporate officers are generally not liable for corporate obligations." IOS Capital, Inc. v. Phoenix Printing, Inc., 348 Ill. App. 3d 366, 371 (2004). "Although a corporate officer is not generally liable for breach of contract, his status does not shield him from liability for tortious acts from which the breach proximately resulted." National Acceptance Co. v. Pintura Corp., 94 Ill. App. 3d 703, 707 (1981). Two torts are alleged of defendants: fraud and negligence. Concerning fraud,

> " '[a]s a general rule[,] a corporate officer or director is not liable for the fraud of other officers or agents merely because of his official character, but he is individually liable for fraudulent acts of his own or in which he participates. [Citation.] The mere fact that a person is an officer or director does not per se render him liable for the fraud of the corporation or

-26-

of other officers or directors. He is liable only if he with knowledge, or recklessly without it, participates or assists in the fraud. [Citations].' " Murphy v. Walters, 87 Ill. App. 3d 415, 418-19 (1980), quoting Citizens Savings & Loan Ass'n v. Fischer, 67 Ill. App. 2d 315, 322-23 (1966).

As for the negligence counts, defendants suggest that, under Illinois law, a director may not be held liable for "mere negligence" in the handling of corporate affairs. As support, defendants cite Brown Leasing and Macaluso. The portion of Brown Leasing in which the liability of directors and officers is discussed is unpublished and hence nonprecedential. But it appears that Macaluso lends some credence to defendants' position.

In Macaluso, the plaintiff sued Jenkins, the treasurer and chairman of a nonprofit corporation called the Industrial Police Association (IPI), and Zecca, the secretary and a director of IPI. The plaintiff sought to hold Jenkins and Zecca personally liable on the plaintiff's contract with IPI. The appellate court held that the corporate veil should be pierced with respect to Jenkins because he had treated IPI's assets as his own. The plaintiff argued that Zecca should also be held personally liable on the contract because she "assisted Jenkins in his conversion of corporate assets" by signing several checks. Macaluso, 95 Ill. App. 3d at 468. The plaintiff argued that Illinois law "imposes personal liability to third-party creditors upon officers who knew or should have known of the conversion" and cited Blocker v. Drain Line Sewer & Water Co., 5 Ill. App. 3d 289 (1972). Macaluso, 95 Ill. App. 3d at 468. The Macaluso court believed that Blocker did not "go that far":

"Blocker does not create an exception to the general rule that officers and directors are not personally liable for the corporation's debts and obligations. While there is evidence that at the direction of the treasurer, Jenkins, Zecca signed checks which assisted him in converting corporate assets into his own personal assets, and while this negligent conduct as a secretary

may have created some liability for the corporation, it does not create a personal liability for all corporate debts." Macaluso, 95 Ill. App. 3d at 468.

Thus, Macaluso held that Zecca's negligence in handling corporate affairs did not itself render her personally liable for the corporation's debts, including the debt to the plaintiff.

Plaintiffs, contending that a director's negligence may indeed give rise to personal liability, cite National Acceptance, which states:

"[A]lthough [a corporate] officer is not liable for the corporation's torts simply by virtue of his office, corporate officer status does not insulate him from individual liability for the torts of the corporation in which he actively participates. [Citations.] Thus a corporate officer may be liable for the negligence of the corporation [citation]; for fraud [citation]; trespass to realty [citation]; wilfully inducing breach of contract [citation]; and conversion [citation]." (Emphasis added.) National Acceptance, 94 Ill. App. 3d at 706.

For the proposition that a director may be held personally liable for the "negligence of the corporation," National Acceptance cited McDonald v. Frontier Lanes, Inc., 1 Ill. App. 3d 345 (1971). National Acceptance, 94 Ill. App. 3d at 706.

In McDonald, the plaintiff brought a negligence action against Frontier Lanes (Frontier) and Ceresa, who was Frontier's president, sole shareholder, and manager. The plaintiff was injured when she fell into a hole in the grassy parkway that separated the sidewalk from the parking lot owned by Frontier. The evidence showed that Frontier had had a gas line installed in the parkway and that the fill placed over the gas line was expected to settle 9 to 18 inches. Of the parkway, Ceresa admitted that "he had known of a defect at that place for some time but not its extent." McDonald, 1 Ill. App. 3d at 350. The appellate court held that, on the evidence at trial, Ceresa was personally liable for the injury. The court first cited that rule that "an officer of a corporation is insulated from personal

liability for negligence of the corporation unless he participated in the wrongful act or had such knowledge thereof as to give rise to liability." McDonald, 1 Ill. App. 3d at 357-58. The court went on:

"In this case[,] Ceresa was the president, sole shareholder[,] and manager of Frontier. He owned and operated the business and its corporate acts or omissions could only be those participated in by him. The acts and omission[s] of Frontier giving rise to the negligence charged in the case were not isolated incidents brought about by conduct of an employee, for example, but were a part of the general mode of operation of the corporate business under Ceresa'[s] sole power of direction and control." McDonald, 1 Ill. App. 3d at 358.

The McDonald court rested its holding on the fact that Ceresa, as the sole conduit for action by the corporate entity Frontier, was perforce a participant in the negligent action by that entity. McDonald cited Peck v. Cooper, 112 Ill. 192 (1884), Miller v. Simon, 100 Ill. App. 2d 6 (1968), and Lowell Hoit & Co. v. Detig, 320 Ill. App. 179 (1943).

In Peck, the plaintiff, an African-American, was forcibly ejected from a bus by its driver. The bus was operated by a company of which the defendant was president. The supreme court upheld the finding that the defendant was individually liable for the plaintiff's injuries because the evidence showed that the defendant "gave the general order" that drivers of the company were "to exclude colored persons" from the buses. Peck, 112 Ill. at 194.

In Miller, the appellate court upheld a finding that the defendants, officers of a real estate development firm, were personally liable for trespass to the plaintiff's land. The defendants were developing land contiguous to the plaintiff's when they entered her property and removed topsoil. The court said:

"One who orders, aids, directs, abets, or assists the commission of a trespass is liable for the resultant damages, even if such an individual did not benefit from the trespass. [Citations.] The two officers are not insulated from liability for the tortious acts of the defendant ***, since it has been well established that an officer of a private corporation is liable for any tort of the corporation in which he participates or authorizes, even though he was acting for the corporation in the commission of the tortious activity. [Citation.] There was ample evidence that [the defendant] Isidor Simon, doing business as I. Simon & Son, a sole proprietorship at the time of the trespass, directed some or all of the improvements for the *** development. He admitted that he personally instructed the engineers in the removal of trees in the area. [The defendant] Ned Simon testified that he knew that the topsoil had been removed and that he even knew where the plaintiff's removed topsoil was stockpiled." Miller, 100 Ill. App. 2d at 9-10.

The holdings in McDonald, Peck, and Miller rested on evidence that the corporate official ordered, and hence participated in, the tortious conduct, whether negligent or intentional. The cases appear to lay down a "participation" requirement for the personal liability of corporate officials. Thus, they seem to imply what Macaluso expressed, that a corporate official may not be held liable for a tortious act in which he himself did not participate but was nonetheless negligent in failing to prevent.

Lowell Hoit, however, complicates the picture. There, the plaintiff sued the defendants, directors of a grain elevator, for conversion of grain the plaintiff had stored at the elevator. The manager of the elevator sold the grain to a third party without the consent of the plaintiff, who sought to hold the directors personally liable. The appellate court agreed with the trial court that the defendants were not liable for the conversion perpetrated by the manager. The court began by drawing a distinction pertaining to the liability of directors:

"The question of liability of a director in a corporation for the acts or omissions of officers or agents, <u>other than codirectors</u>, admits of various conditions. Ordinarily, where such director can be held liable for the acts of subordinate officers, he must participate therein, be guilty of lack of ordinary and reasonable supervision, <u>or</u> be guilty of lack of ordinary care in the selection of such officer. The duties of a general manager of a corporation are usually more extensive than those of a mere director." (Emphases added.) <u>Lowell Hoit</u>, 320 Ill. App. at 182.

This passage appears to suggest that a director will be personally liable for the acts of corporate subordinates, <u>i.e.</u>, those other than fellow directors, if the director failed to exercise due care. The court then turned immediately to the issue of "the liability of a director for a tort committed by a corporation," and said:

"Liability in such instances on the part of the director is generally considered to rest upon whether he actively participated in the wrongdoing, and it seems impossible to lay down any governing rule further than that the test is to be whether the director authorized or participated in the alleged wrongful act. The mere fact that a person is a director in a corporation does not necessarily render him liable for the torts of the corporation or its agents. In other words, directors are not to be held liable for the negligence of the corporation merely because of their official relation to it. And the general rule would seem to be that he must participate in the wrongful act, or have such knowledge thereof as to give rise to liability. The foregoing observations, of course, are made in consideration of the circumstance that the director denies knowledge and participation, and hence excludes any theory of authorization or direction." <u>Lowell Hoit</u>, 320 Ill. App. at 182-83.

Here, with respect to "torts of the corporation," there is a participation requirement. A "tort of the corporation," however, is not defined. If, as it seems, the two passages are meant to be complementary, an "act of the corporation" would be an act committed by a fellow director rather than a corporate subordinate.

Such a distinction, which imposes a higher bar of liability with respect to acts of a codirector, also seems drawn in Chicago Title & Trust Co. v. Munday, 297 Ill. 555 (1921), where a receiver sued the directors of a bank for negligence in the supervision of two officers who defrauded the bank. The complaint alleged that the defendants "gave no supervision and made no inquiry whatever, notwithstanding that they were directors of the bank and had knowledge of the incompetence and dishonesty of [the officers] and their fraudulent misuse of the funds of the bank." Munday, 297 Ill. at 561. The court held that the complaint adequately pled negligence by the directors. The court's analysis began with this statement of the governing law:

"[W]hen one takes a position as director of a bank he becomes trustee for the depositors as well as for the stockholders and is bound to the observance of ordinary care and diligence, and is hence liable for injury resulting from the non-observance, where such non-observance is due to the negligence of such director. [Citation.]

In Wallach v. Billings, [277 Ill. 218 (1917)], *** it is distinctly said that it is not the holding of the court that directors cannot be held for mere inaction where such inaction has been the proximate cause of loss. *** As was said in Warner v. Pennoyer, [91 F. 587, 591 (2d Cir. 1898)], before a director can be made responsible for losses which have occurred through the mismanagement or dishonesty of a cashier it must appear that such losses resulted as a consequence of the omission of some duty on his part. This well states the rule. Moreover, it cannot be said that an individual director is responsible for the negligent

omissions of those who are his co-directors unless he shall have actively or passively participated in such negligent omissions." (Emphases added.) Munday, 297 Ill. at 562-63. Here the court seems to distinguish a director's general duty of "ordinary care and diligence" from the director's less strict duty of avoiding active or passive participation in the wrongful acts or omissions of codirectors. That distinction also seems suggested in the Warner decision cited by Munday. In Warner, directors of a bank were sued for the fraud of the bank's executive officer known as the cashier. The court said:

"[The cashier] is the [bank's] executive officer, who transacts its daily affairs. The directors cannot divest themselves of the duty of general supervision and control by committing this duty to him, but they properly may intrust to him all the discretionary powers which usually appertain to the immediate management of its business. [Citations.]

*** Before [the directors] can be made responsible for losses which have occurred through the mismanagement or dishonesty of the cashier, it must appear that such losses resulted as a consequence of the omission of some duty on their part. If, in all probability, these would have occurred just the same, notwithstanding that they had been ordinarily diligent and vigilant, there is no justice in shifting them upon the directors, and no principle of law to justify it. They are responsible for their own acts and omissions, but not for those of co-directors in which they have not actively or passively participated." (Emphases added.) Warner, 91 F. at 591.

The court held that the evidence established the personal liability of the directors serving on the bank's discount and examining committee, which made weekly visits to the bank and reviewed the documents prepared by the cashier. The remaining directors were not liable, because there was no evidence that they "were cognizant of the neglect of duty" by their colleagues. Warner, 91 F. at 593.

Foreign authorities may hold the key to understanding the dichotomy in the standards addressing the personal liability of directors. See Hill v. International Products Co., 129 Misc. 25, 59, 220 N.Y.S. 711, 744 (Sup. Ct. 1925) (the defendants were not personally liable for false representations of fellow directors to stock purchasers, because the defendants neither authorized, ratified, nor knew of the misrepresentations); Davsko v. Golden Harvest Products, Inc., 965 F. Supp. 1467, 1474 (D. Kan. 1997) (" '[a] director or other corporate officer is not liable for false statements made by another officer in which the former did not participate nor authorize nor sanction' "), quoting 3A W. Fletcher, Private Corporations §1150, at 344 (1986)). It is because "one director is not the agent of another" that Hill and Davsko applied a requirement of active or passive participation to trigger the personal liability of directors for the acts of their peers. See Hill, 129 Misc. at 59, 220 N.Y.S at 744; Davsko, 965 F. Supp. at 1474, quoting 3A W. Fletcher, Private Corporations §1150, at 344 (1986).

Macaluso, McDonald, Peck, and Miller all appear to lay down a categorical participation rule for judging the personal liability of corporate officials. Lowell Hoit, Munday, and Warner, however, appear to make a distinction with respect to directors. As we read those cases, a director is personally liable for the acts of subordinates if he fails to exercise ordinary care, but he is personally liable for the acts of coequals, i.e., codirectors, only if he participates, actively or passively, in the acts. If, as we infer, these standards are meant to be complementary, participation would mean knowing or reckless action or omission rather than negligence.

Applied to the case at hand, the Macaluso line of decisions would unqualifiedly require defendants' participation in Krupa's misconduct as a condition of their personal liability. Under the Lowell Hoit line of cases, however, there is a potential tension. As defendants' fellow director, Krupa was their coequal. Yet the record suggests that the board had oversight over Krupa and hence that

he was in a sense their subordinate as well. We need not resolve which line of cases truly represents Illinois law or how Lowell Hoit would apply in this hybrid situation. Rather, we find that there is no triable issue of fact that defendants were even negligent with respect to Krupa, much less that they knowingly or recklessly participated, whether actively or passively, in Krupa's conduct.

We can further define the concept of negligence applicable here. Lowell Hoit holds that a director's personal liability for the acts of a subordinate officer will lie where the director was "guilty of lack of ordinary care in the selection of such officer" or "guilty of lack of ordinary and reasonable supervision" (Lowell Hoit, 320 Ill. App. at 182). Lowell Hoit seems to have in view the torts of negligent hiring and retention. Plaintiffs allege negligent hiring, retention, and supervision. While at least one appellate court decision has suggested that negligent supervision and negligent retention are distinct torts (see Vancura v. Katris, 391 Ill. App. 3d 350, 368 (2008) (claiming that "negligent supervision" is an "entirely different type of tort" than "negligent hiring and retention")), our supreme court has not distinguished the two in the employment context (see Van Horne v. Muller, 185 Ill. 2d 299, 310-11 (1998) (not distinguishing between negligent supervision and retention claims)).[4] "Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." Van Horne, 185 Ill. 2d at 310. "An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or

---

[4]As the appellate decisions have defined it, negligent supervision applies not just in an employment context but in any scenario where there is a duty to supervise. See, e.g., State Farm Fire & Casualty Co. v. Mann, 172 Ill. App. 3d 86, 92 (1988) (plaintiff alleged parent negligent in supervision of child).

should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." Van Horne, 185 Ill. 2d at 311.

In the case of corporate directors, we keep in mind Lowell Hoit's emphasis on the practical necessity for directors to accord subordinate officers a measure of autonomy in the management of the business:

"[D]irectors, although authorized and justified in committing the details of the conduct of the corporate business to subordinate officers, are not thereby justified in withdrawing their supervision and control of corporate affairs. They cannot thus divest themselves of the duty of general supervision and control by committing this duty to a subordinate officer. However, of necessity, it becomes proper that they entrust to subordinate and executive officers the discretionary powers which usually and ordinarily appertain to the immediate management of the particular business. *** Courts will treat directors with more leniency with respect to a single isolated act of fraud on the part of a subordinate officer or agent, than when the practice appears to have been so habitually and openly committed as to have been easily detected upon proper supervision." Lowell Hoit, 320 Ill. App. at 181-82.

Having set forth the relevant law, we turn to the arguments of the parties. Plaintiffs argue that, in pressing for summary judgment on their claims, defendants are arguing "issues already addressed and rejected by this Court" in Zahl I. According to plaintiffs:

"This Court already determined that if the Plaintiffs came forward with proof during discovery in support of their well-pled allegations, that would be adequate to 'prove that Krupa acted with the apparent authority of defendants in taking plaintiffs' money pursuant to the

investment agreements.' [Zahl I, 365 Ill. App. 3d at 663]. *** The record evidence fully satisfies the outline of evidence that should satisfy the trial court and allow the Plaintiffs the right to proceed to trial."

Plaintiffs further contend:

"As this Court already determined, '[Ron] Krupa acted with the apparent authority of defendants' [(Zahl I, 363 Ill. App. 3d at 663)]. Accordingly, this Court should reverse the trial court's summary judgment ruling in favor of [defendants] and remand this case for trial."

Defendants, we think, have the better view of how Zahl I relates here:

"When read in context, this Court in Zahl I was only addressing whether [Krupa's] conduct could be imputed to Jones & Brown Company as his principal; this Court in Zahl I was not discussing whether [Krupa's] conduct could be imputed to [defendants] personally."

And further:

"Nowhere in the analysis of [Krupa's] apparent authority in [Zahl I] does this Court suggest that [Krupa] had apparent authority to act on behalf of [defendants]. Nor does this Court's opinion in Zahl I suggest [that] a finding that [Krupa] had apparent authority to act on [behalf] of his principal, [Jones & Brown], without more would result in [defendants] being liable for [Krupa's] fraudulent scheme." (Emphasis added.)

We agree with defendants that Zahl I did not dispose of the issues at hand here. To demonstrate this, we must closely compare this case with Zahl I. Plaintiffs' amended complaint sought judgment against Jones & Brown and defendants as its directors and officers. (Jones & Brown was later dismissed from the suit.) In the breach-of-contract and fraud counts, plaintiffs alleged that Krupa acted as the agent or apparent agent of "JONES & BROWN COMPANY INC. and its DIRECTORS." Although plaintiffs did not appear to recognize it in their amended complaint,

Jones & Brown was subject to a different standard of liability than defendants under the fraud and contract counts. The claims against Jones & Brown, resting on the allegation that Krupa was its agent or apparent agent, asserted vicarious liability. See Bank of Waukegan v. Epilepsy Foundation of America, 163 Ill. App. 3d 901, 906 (1987) ("A principal is liable for those acts of its agent which the agent has actual or apparent authority to perform"). Although Krupa was alleged to be the agent or apparent agent of "JONES & BROWN COMPANY INC. and its DIRECTORS" (emphasis added), the amended complaint presented no ground for a separate inference that Krupa was the agent or apparent agent of defendants as well as of Jones & Brown. All acts and omissions alleged as the basis for liability were alleged collectively of "JONES & BROWN COMPANY INC., and its DIRECTORS" without any discrimination among defendants. See Meyer v. Holley, 537 U.S. 280, 286, 154 L. Ed. 2d 753, 761, 123 S. Ct. 824, 829 (2003) ("in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents"; "[a] corporate employee typically acts on behalf of the corporation, not its owner or officer"). Defendants would be liable, if at all, because of their direct culpability for Krupa's misconduct and not simply because of their status as corporate officials. It is that very status, in fact, that gave them presumptive insulation from personal liability for Krupa's misconduct. "[W]hile corporate status generally shields corporate officers and shareholders from liability from corporate debts and obligations, this protection does not shield corporate officers from their own wrongdoing." Safeway Insurance Co. v. Daddono, 334 Ill. App. 3d 215, 219 (2002). Thus, we agree with the trial court below that "the apparent authority arguments *** raised by the plaintiff[s] go to the corporate defendant, Jones & Brown, and not the individual directors."

The negligence counts alleged omissions of "JONES & BROWN COMPANY, INC. and its DIRECTORS." Unlike the fraud and contract counts' implication of vicarious liability, the negligence counts alleged direct culpability of defendants.

In their joint motion to dismiss the amended complaint, defendants and Jones & Brown attacked all counts on the ground that plaintiffs failed to plead that "Krupa had either actual or apparent authority to act on behalf of Jones & Brown when Krupa entered into the purported agreements with Plaintiffs." Defendants and Jones & Brown did not allude to the standards for personal liability of defendants or address the direct culpability alleged of defendants under the negligence counts. Moreover, defendants and Jones & Brown did not attempt to distinguish defendants from Jones & Brown with respect to any of the conduct that was collectively alleged of them. The trial court, strictly adhering to the arguments made in support of dismissal, focused on whether Krupa was the agent or apparent agent of Jones & Brown. The court did not distinguish defendants from Jones & Brown, address whether defendants were personally liable for Krupa's conduct, or examine the allegations of direct culpability in the negligence counts.[5]

Our analysis in Zahl I was correspondingly narrow. As they were in the amended complaint, the motion to dismiss, and the trial court's analysis, defendants and Jones & Brown were a monolithic agent in our discussion; we did not even allude to the possibility that the conduct alleged collectively of defendants and Jones & Brown might be attributable to defendants but not to Jones & Brown or vice versa. We held that plaintiffs adequately pled apparent authority, based on two sets of alleged facts: (1) "defendants' " conduct, namely their employing Krupa for 20 years, most recently as

_____

[5]As we noted in Zahl I, 365 Ill. App. 3d at 664, the trial court dismissed the negligence counts based entirely on the affirmative defense of unclean hands and did not reach their merits.

president of Jones & Brown, and providing him various accouterments of office; and (2) Krupa's own conduct, which plaintiffs were entitled to consider "as th[at] of Jones & Brown itself where it was reasonable to do so." Zahl I, 365 Ill. App. 3d at 661.

Zahl I does not have the impact here that plaintiffs claim. Plaintiffs mistakenly believe that, when we held that plaintiffs sufficiently alleged that "Krupa acted with the apparent authority of defendants" (Zahl I, 365 Ill. App. 3d at 663), we meant particularly defendants here, the directors of Jones & Brown. We did not distinguish among "defendants" and indeed (as we have noted) were never asked to. To the extent that defendants were discrete, they were just conduits for the vicarious liability of Jones & Brown. Under any of the counts, defendants' liability would not be vicarious but a matter of their own conduct. We said nothing in Zahl I about defendants' own actions or omissions for purposes of their personal liability. Only now, in this appeal, are we asked to consider defendants' personal liability. The question before us is whether there is a triable issue of fact whether defendants are liable based on their own acts or omissions. We hold that summary judgment in defendants' favor on all counts was proper.

Consistent with our discussion above regarding the substantive standards of personal liability for directors, we assume, without deciding, that defendants would be liable if they (1) knowingly or recklessly participated in Krupa's tortious acts; or (2) negligently hired or retained Krupa. Plaintiffs argue not that defendants knew of Krupa's misconduct while it was occurring but that they were reckless and at a minimum negligent in failing to prevent it or discover it while it was ongoing. We note that plaintiffs presented no evidence that Krupa had a gambling habit or a tendency to deceive when he was hired by Jones & Brown. There is no question, then, of negligent hiring.

Plaintiffs' first argument is that defendants "recklessly turned a blind eye to [Krupa's] excessive and unusual borrowing" from Jones & Brown and were at fault for doing "nothing to investigate

[Krupa's] purported need to borrow more than $214,000 from [Jones & Brown] prior to the investment contracts at issue." (The sum of the loans from 2000 through 2002 was actually $205,000.) Had defendants made that inquiry, they would have discovered Krupa's "prior contacts with Plaintiffs[] and his gambling habits," and plaintiffs "would not have entered into the contracts at issue and *** would not have been injured."

Plaintiffs have failed to raise a material fact question whether defendants were negligent, much less reckless. We begin with the undisputed evidence that Jones & Brown had a custom of making loans to employees. Creighton and Kulakowski, both longtime board members, testified to that custom. Kulakowski testified that, besides Krupa, loans were given to at least two former CEOs of Jones & Brown and a former vice president of sales. Kulakowski himself was once loaned $18,000 or $19,000 to purchase a new car. When Krupa informed Krol, a relative newcomer to the board, of that practice, Krol voiced his disapproval but cited no Jones & Brown policy against making such loans.

Plaintiffs submit that Krupa's requests were "excessive and unusual." Here plaintiffs evidently have in mind Kulakowski's testimony that Krupa's balance of $186,000 as of April 2002 seemed "large" for a nonowner of Jones & Brown such as Krupa. That balance, however, reflected all loans extended to Krupa, and there is no evidence of the reasons Krupa presented for taking the $9,500 loan in 2000 and the $60,000 loan in 2002. As for the $136,000 Krupa requested in 2002, we see nothing to suggest that, given the facts then known to Creighton and Kulakowski, they should have verified Krupa's story before arranging the loan. Krupa's request had undeniable legitimacy on its face, at least when compared to Kulakowski's loan for a car. Creighton and Kulakowski both described Krupa's emotionally charged plea, which undoubtedly enhanced the appearance of sincerity. Also, in 2002, Krupa had been with Jones & Brown for 29 years and had advanced to vice president.

-41-

Kulakowski testified that he had not known Krupa to be untrustworthy. Creighton testified that he "held great trust" in Krupa.

There was, moreover, no indication that Krupa had an unusual taste for gambling. There was office gambling at Jones & Brown but Krupa was no more involved than his fellow employees. Creighton, we acknowledged, testified to his regret for not verifying Krupa's story. We quoted that specific testimony at length and it appears to us that Creighton's perspective throughout that excerpt, and indeed throughout all of his testimony, was overall post facto. He admitted to "poor supervision" based on the "way this turned out" and on "what has happened." We see nothing in the evidence to suggest that Creighton believed his actions were improper given what he knew when he acted on Krupa's request. If there was any custom of verifying the bases for loan requests, even of longtime, highly accomplished, and trusted employees like Krupa, it is not apparent from the record. Plaintiffs are in essence arguing backward from consequences, a tempting but erroneous approach in negligence cases. "In judging whether harm was legally foreseeable[,] we consider what was apparent to the defendant at the time of his now complained of conduct, not what may appear through the exercise of hindsight." Cunis v. Brennen, 56 Ill. 2d 372, 376 (1974). Foreseeability is not "a judgment from actual consequences which were then not to be apprehended by a prudent and competent person." 57A Am. Jur. 2d Negligence §125 (2009) (citing cases). We see no evidence that, when Krupa approached them in 2002, Creighton and Kulakowski had any reason to doubt Krupa's claimed reason for the loan or were otherwise obligated to investigate his story.[6]

---

[6]Creighton and Kulakowski, we acknowledge, were examined thoroughly on their failure to apprise their fellow board members, or the owners of Jones & Brown, of the $136,000 loan until after Zahl came forward. Creighton was also questioned pointedly about his approving the loan without

Defendants were also at fault, plaintiffs claim, in granting Krupa too much autonomy. According to plaintiffs, it was the "liberal allowance of [Krupa's] use of his Company office, letterhead, phone, credit card, [and] car" that "fully and freely provided the means to allow [Krupa] to contract with Plaintiffs in a completely free and unfettered manner." Plaintiffs emphasize Creighton's admission that it was a mistake not to have more strictly enforced the general understanding at Jones & Brown, attested to by Creighton and Kulakowski, that company space and materials were not for personal use. Here again we find Creighton's admissions lacking the weight that plaintiffs assign them. Creighton frequently cited "hindsight" and his current "perspective" as his criteria for judging the strength of Jones & Brown's policies. As the court in Lowell Hoit observed, directors of necessity devolve upon subordinate officers the "immediate management of the particular business." Lowell Hoit, 320 Ill. App. at 182. Creighton was never asked how Jones & Brown's policies could have been strengthened to prevent such fraud as Krupa's without intruding on the trust that is in the very nature of the corporate structure. By all appearances, Krupa especially earned that trust. Notably, of Jones & Brown's policies toward personal use of letterhead, the company material most prominent in the fraud, Creighton said, "I suppose it would be pretty easy for anybody to put letterhead paper in their case and leave at any company anywhere" (emphases added). To have searched Krupa's person and effects for company letterhead upon his leaving the office each night would negate the vital entrustment and violate the underlying trust. Moreover, it is unlikely that the most intrusive of measures could have thwarted Krupa's machinations given the resourcefulness he

---

consulting the entire board. Plaintiffs do not single out these acts or omissions by these particular directors. Their focus, rather, is what they frame as defendants' collective failure to verify Krupa's story.

showed in defrauding Zahl and Gene. We have no reason to believe that Krupa could not have arranged the fraud mostly off-premises and on his own time. Plaintiffs again are arguing ad hoc, using little more than hindsight to accuse defendants of lacking foresight.

Plaintiffs compare this case factually to People ex rel. Hartigan v. E&E Hauling, Inc., 153 Ill. 2d 473 (1992), and National Acceptance. Both comparisons are nonstarters. The plaintiffs in Hartigan alleged that the defendant, the director of a corporation, " 'instituted the policies' " on which were based the corporation's fraudulent misrepresentations to the government. Hartigan, 153 Ill. 2d at 502. The supreme court held that these allegations were sufficient to state a fraud claim against the defendant personally. In National Acceptance, there was testimony that the defendant facilitated his corporation's conversion by endorsing to the corporation checks that were due the plaintiff. The court held that the defendant's "active participation" made him personally liable for the conversion. National Acceptance, 94 Ill. App. 3d at 707. Defendants here had no such knowing involvement as did the defendants in Hartigan and National Acceptance.

A closer case factually is Lowell Hoit. In Lowell Hoit, as we recounted above, the plaintiff had oats stored at a grain elevator of which the defendants were directors. Without the plaintiff's consent, Herrmann, the manager of the elevator, sold the grain to a third party. The plaintiff sought to hold the defendants personally liable for the conversion even though the evidence showed that they had no knowledge that the plaintiff even had grain at the elevator. The court held that the defendants were not reckless or negligent in their oversight of Herrmann:

"Nothing appears in this case to indicate that [the defendants] did not exercise care and prudence in their selection of the agent Herrmann. Neither does it appear as if they sought to divest themselves of a general supervision of the conduct of the business. Further, nothing appears to indicate that they had any knowledge of, or had acquiesced in a continuous or

-44-

repeated course of conduct on the part of Herrmann such as committed in the present instance. Courts will treat directors with more leniency with respect to a single isolated act of fraud on the part of a subordinate officer or agent, than where the practice appears to have been so habitually and openly committed as to have been easily detected upon proper supervision. We do not consider the directors to be personally liable under the evidence in this case. Here we find a single act secreted by the subordinate officer from the directors, with the contract locked up by him without their knowledge of its existence, and no corporate record to come before them reflecting such transaction." Lowell Hoit, 320 Ill. App. at 182. Here, of course, Krupa did not commit a "single act" of fraud, yet neither was his fraud so "openly committed as to have been easily detected upon proper supervision." As Lowell Hoit recognizes, directors have a right to entrust immediate corporate governance to officers. There was no evidence that defendants had any reason to suspect Krupa of wrongdoing or the potential for it. It is in retrospection alone that Krupa appears unworthy of the great trust defendants placed in him.

Therefore, we find that there is no issue of material fact whether defendants were reckless or negligent in regard to Krupa. Accordingly, summary judgment in favor of defendants on all counts was proper.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County. Affirmed.

SCHOSTOK and HUDSON, JJ., concur.